Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this Honorable Court. Good morning. We have four appeals that are scheduled for oral arguments this morning on the court's oral argument calendar. Judge Rosenbaum, Judge Hall, and I are ready to proceed with the arguments. Ms. Geddes is the courtroom deputy and she will serve as the timekeeper and she will let you know counsel when your time to argue has expired and she will also provide you with a two-minute warning before your time expires. And so we are ready to proceed with the first argument. The case is filed the United States of America v. Larry Masino and Dixie Masino. Alicia Forbes is here for the United States. David McGee is here for the Masinos. And Ms. Forbes, are you ready to proceed with your argument? I am, Your Honor. You may. Good morning. Alicia Forbes appearing on behalf of the United States. When considered in the light most favorable to the government, the evidence at trial in this case was sufficient for a reasonable juror to find both defendants guilty beyond a reasonable doubt on all counts, including the guilty verdict on count one that was rendered by the jury but acquitted by the district court. As to count one, which charged conspiracy to commit wire fraud, the government was required to prove that two or more persons agreed to commit an unlawful plan, that is wire fraud, and that the in it. The evidence at trial showed that the defendants agreed to use fraudulent misrepresentations to illegally retain excess bingo profits owed to the charities as bargained for in their lease agreement contracts. The charity representatives testified that they were told by the defendants that under those contracts they would be receiving a lawfully run bingo operation from which the charities would receive all bingo proceeds minus fees paid to the workers that were running the bingo games. And depending on the year, a $21,000 to $35,000 per week lease fee that would be paid back to racetrack bingo. The defendants assured the charities that the payments to their workers were allowed under the Florida bingo statute and that the rental fee was reasonable for the required by the Florida bingers bingo statute. But both defendants made these representations to the charity representatives knowing that neither was true. Thus, the government proved in the light when viewing the evidence in light most favorable to the government that the defendants conspired and intended to defraud the charities under those lease agreements by claiming that this business agreement was legal and permissible under the bingo statute. As Forbes, how are the charities harm? If they were the evidence that the charities were harmed, because our precedent and tackle off requires that the government is required to prove more than just that there was an intent to see that there was a conspiracy to deceive the charities, but conspiracy to harm the charities as well. So where would we find that evidence in the record? That evidence is in the fact that the agreement between the charities and the defendants on behalf of racetrack bingo was that the charities were going to lawfully retain all bingo proceeds minus the lease fee and the pay and payments that they had to make and the bills that they had to pay for bingo supplies. And the harm was that the defendants unlawfully retained excess bingo proceeds by intending to defraud the charities of those proceeds by making misrepresentations regarding the fact that the lease fee that they were charging was a lawful lease fee under the bingo statute, which the jury found it was not in the government proved it was not because it was $21,000 a week for a warehouse in Fort Walton, Fort Walton Beach that the government expert showed was very high in excess of a market rate for a building of that size and the services that racetrack bingo was purporting to provide. In addition, the defendants were were retaining bingo proceeds that lawfully belong to the charities under the agreement in the payments that they were paying to their employees again under the misrepresentation that those payments were lawful under the bingo statute. So the harm that the charity suffered Well, they got they got what they bargained for with the Musinos. I mean, they knew what was going on. And they chose to participate in this scheme. And if they had not chosen to participate in it, they would have made no money. And instead, they made millions that they would not have otherwise made. So it's hard to seems like that's the reason that the court granted the motion for acquittal because there was an absence of an agreement to intend to harm the charities. A lot respectfully, the government would disagree because again, what count one charged first of all was a conspiracy. So the fact that the charities were not in fact defrauded is not only not an element of substantive wire fraud, but it's not an element of conspiracy to commit wire fraud. The evidence that the court should be looking at is evidence of the defendant's intent to defraud the charities out of money that they believe that belongs to the charities. And that's where the intent to harm is the question of whether there was actual harm is essentially irrelevant for a conspiracy charge whether the charities were in fact actually harmed. I wouldn't know that the government maintains the position that the agreement between the charities could have otherwise been lawful under the bingo statute had racetrack bingo, in fact, done what it had promised, which was only charged rent actual market rent for leasing of the space. And they did not in fact pay their employees for the conduct of bingo. Although the district court disagreed with us, the government believes that the evidence shows that nonetheless, it was clear that the defendants acted willfully in making their unlawful agreement and that I want to go back to Judge Wilson's question about what they bargained for. As I understand it, what they bargained for was the profits after actual expenses. And what they got was profits after inflated expenses, grossly inflated expenses that were not actual expenses. Is that accurate? It's partially accurate. What they bargained for was a lawfully run bingo operation. And what the defendants in there to have a awfully run operation, you can only charge actual expenses on the rent. Correct. You can only charge a rent that is similar to similar premises in the locale. And you can only pay for actual expenses out of the bingo proceeds. You cannot use bingo proceeds to pay profits. You cannot use bingo proceeds under the Florida statute to pay workers for the conduct of bingo. No person or organization can make a profit. That's what they bargained for. And what did they actually get? What they what they got was an unlawful bingo operation. And so as a result of the defendants running the operation unlawfully, they did not in fact get what they bargained for, because they did not in fact get all of the bingo proceeds from the bingo games conducted at racetrack bingo as bargained for they they they entered into the contract as a result of the defendants conspiracy and intent to defraud under they agreed to the lease fee under the misrepresentations that the defendants made that that lease fee was reasonable that they were only paying actual expenses, and that the the payments that were also being taken off the top of bingo proceeds were lawful. So to the extent that the defendants argued and the district court agreed that they got exactly what they bargained for thinking misguided. They didn't, in fact, yes, they agree to a specific lease amount. But again, it was they only made that agreement based on the defendants misrepresentations. And that's the intent to defraud and the intent to harm. What do you have to say about count two, they say they should have got judgment acquittal on the on count two, because there was insufficient evidence that they willfully and knowingly violated the statute by having the non charity members conduct bingo and retain the proceeds. As the count to, again, the evidence when viewed in the light most favorable to the government was sufficient for a reasonable return to find the defendants owned and operated an illegal gambling business. The best way to summarize it is to quote this court's prior ruling in the interlocutory appeal in this case, which said that a jury could find racetrack bingo was an illegal gambling business in violation of count to if the government proved beyond a reasonable doubt that quote, racetrack bingo illegally allows charities to sponsor bingo games without their direct involvement, or that racetrack bingo forfeits its right to conduct bingo by not returning all of the proceeds from those games to the players. As pointed out in the brief, most of the elements of count to were uncontroverted, a lot of the jurisdictional arguments, but the element that your honor asked about in the defendants focused on was willfulness, because we had to show that racetrack bingo was a law was a illegal violation of state law and the bingo statute in order to be a criminal gambling violation requires willfulness. But I would submit that there was sufficient evidence that the defendants acted willfully and operated racetrack bingo as a willful violation of the bingo statute. They had clear knowledge of the statute. There were several emails admitted into evidence where they discussed the bingo statute together and with other people, and they kept various copies of the statute text itself both at racetrack bingo and at their houses. Your time set has expired and Judge Rosenbaum is trying to get your attention. Oh, thank you. Yeah, sure. That that that you were able to hear me. Let me ask you, how does, um, with respect to count one, how does the Florida statute in particular subsection three affect the analysis of it all? In other words, um, the district court concluded that under to a that applied only to the charities were running the bingo operations. If I understand correctly. And so it appears that three subsection three would be what would apply in this situation, which talks about all of the excess proceeds having to go to the players as opposed to the charities. So my question is, how does that affect the analysis? And is there some type of freestanding wire conspiracy to commit wire fraud claim outside of the suggested by your theory? Um, so the interplay between the two is that, um, the government again, our position remains that both subsection to a, which is the section dealing with charitable organizations and the conditions under which they can conduct bingo and subsection three, which is, uh, the conditions under which any other organization can conduct bingo are both at play under count to. But the district court, unfortunately, um, did a pre verdict judgment of acquittal as to to a. And so that's why the government as to count to proceeded under subsection three only how it interplays with count. One is that, um, as I stated before, the government's position is that this agreement between the charities and racetrack bingo could have been if construed correctly, and the defendants had not misrepresented facts could have been lawful under subsection to a. However, the district court disagreed with us. And so that's why, um, the wire count and the misrepresentations there, um, in light of the jury's special verdict and the court's findings is sort of is isolated to misrepresentations with racetrack bingo's ability to with respect to their misrepresentations about racetrack ability to lawfully, um, take those bingo proceeds versus the sufficiency of the evidence as to count to, um, bears on the defendants knowledge of the bingo statute that they could not retain profits, which is what subsection three said that they can't retain profits. Everything has to go back to the players. Um, and we believe that the evidence show that I just want to make sure I'm understanding. Are you saying that count one, the conspiracy count is based on this sort of freestanding wire fraud theory, separate and apart from the statute? Not apart. No, not apart from the statute. No. Okay, so in order so you would agree that in order to prevail on count one, we would have to agree that under the statute, the racetrack defendants would have to have, um, we're required under the statute and I guess presumably under to a to provide excess proceeds to the charities as opposed to the players. Is that right? Uh, I believe that under count one, I guess the answer is both. Is that yes, that it is our position that the statute permitted that and that but for the defendant's misrepresentations, that is what should have gone to the charities. Um, however, regardless of that, um, the government believes there was sufficient evidence to show wire fraud even under the district court's construction of the statute, which is that that would not have been permit legal either. Um, and I guess that was your question about it sort of being outside the bingo statute that yes, in that respect, based on the contract itself and the misrepresentations that induce the charities to enter that contract and the money that would have been owed to the charities had the contract been induced correctly. Um, in that respect, yes, under the district court's interpretation of bingo statute, that would be a misrepresentation that for a contract that under the district court's belief would not have been legal anyway, which is why the charities weren't harmed. But regardless, it's still a contract entered in between parties. A fraudulent misrepresentation was made, um, through the use of a wire and the defendants conspired and intended for that to happen. And that's why they're guilty of count one. Thank you, Miss Ford. Uh, I told you had another question. Just one. I knew there was a post verdict judgment of acquittal. Um, that that government appeals. What is the pre verdict judgment of acquittal? And do you appeal that way? We do not because we don't have a authority to do that because the judge made that finding prior to the entry of the jury verdict. It was a partial grant of the defendant's mid trial motion for judgment of acquittal. You don't have a right to appeal. That's correct. I'm just simply stating for the record for whatever purposes is that obviously the government still disagrees with that, but it is not part of our appeal or the the government couldn't appeal it because of correct verdict of acquittal before the jury. Okay, rule. Okay. And Miss Forbes, you've reserved some time for rebuttal. We'll hear from Mr McGee on behalf of the Masinos. Am I on? Thank you, Judge. Uh, for the record, I'm David L. McGee, the firm of I want to begin with the argument concerning that Judge Rogers is dismissal of count one in the case. Um, we obviously agree with the judge's decision. It was pursuant to our emotion. Count one charged conspiracy to commit wire fraud. Basically, the conspiracy. The allegation is that the Masinos conspired to defraud the charities by falsely telling them that their bingo parlor complied with the Florida bingo statute and particularly with the provisions regarding paying people to conduct bingo and the rent being comparable to that charge for other similar premises, both both of which are provisions within the statute. Um, the trial court dismissed account. The government has contested that dismissal. We find multiple problems with the government's argument. The first begins with what Judge Wilson was discussing. That is the tackle of requirement that there be an intent to harm. Um, a wire fraud conspiracy. There is no fraud unless there is an intent to harm. In this case, there you cannot find an intent to harm. The charities in this case were never asked to pay any money at all. They were. They came out of pocket. Nothing. They were not asked to take any risk over the years that they were involved with racetrack bingo. And this starts in 1992. And the conspiracy in the case only starts in 2006. But they were. They have been going for a long time. They had been paid 10 10 more than $10 million. If you look at, uh, the check, there's an exhibit in the case. There's a check put on the wall by the charities in 2012, showing that the charities had received up to that point about $13.5 million. By the time this case gets filed, it's about $14.5 million. So you've got a case in which the charities took no risk at all. And how much did your clients receive for the seven or $8 million they got for the rental? I can't give you the exact amount, but they did. They did receive exactly what the contract said, and it was a substantial amount. You're talking about bottom line numbers, which I don't know that all of this matters. But your clients got about $8 million in revenue from written that building at 1 to $2,000 a bingo session. Is that correct? That's what the evidence show. I can't tell you the exact number, but it is a substantial number. Yes, ma'am. Well, is it over seven million? I don't know. I don't know off the top of my head the exact figure. What I can tell you. Oh, come on. You know what the evidence was. I don't know exactly for exact figure ballpark. It's 7 to 9,000,006. What could have been in there? And I honestly don't remember the exact figure. I know it was asking for exact figure, sir. I'm asking you going on about how much charities got. The question is how much your clients got out of this supposed charity of charity operated off of the charity. Bingo. How much did they get? They got over six million. Will you agree with that? Yes, ma'am, I would. Okay, thank you. And let me go back to the point. The charities lost nothing. They were paid well over $10 million over that period of time. The that they charge inflated expenses. I would point out that the jury acquitted the machine was on the count of conspiring for to charge inflated expenses. Um, let me go back to where I was in the argument. The charities lost nothing, took no risk, made a substantial amount of money. Second. So that that is suggestive, not a fraud. That is suggestive of maybe there's deceit, but there is no fraud. This had been going on at the time. The charge conspiracy began 2006. They've been doing this for well over a decade. The machine knows knew they were gonna that the charities were not gonna lose any money, and they knew they were gonna be paid handsomely for taking no effort at all, taking no risk at all and putting up no money at all. So did these machinists have an intent to harm? No, they had an intent to pay them a substantial amount of money. Truth is, machinists made money, too. But the condition of them making money is that the charities had to make money. Also, I told you, let me ask you a question. Put on. Put on another half for a moment. If you were the government and you and I'm not talking about your clients, but let's just hypothetically talk about individuals who overcharged on rent, uh, and and charged for things that were not, um, expenses that are how could the government successfully charge them provided that a jury found the correct facts? Um, for violating the law or your position instead that there's no way that the government could criminally charge individuals who systematically cheated charities out of the proceeds that they were entitled to under the statute. Well, first of all, I take issue with your your suggestion that they systematically cheated them out of proceeds. Again, I'm not talking about your clients were talking hypothetically. I'm trying to understand whether your position is that this kind of conduct that we're talking about hypothetically could never be charged or whether it could be charged. But it was just done. This isn't the way you would do it. You would not do it in the way that the government did it in this case. First how? How would you charge? How could you charge that kind of funnel? We all agree that, um, maybe you don't agree. Maybe your position is that it doesn't violate the law for individuals to inflate the rent so that they can get money that the charities otherwise should be getting under the statute. Again, not talking about your clients and talking hypothetically. Well, first of all, the charities would not have been getting the money. Okay, if in different factors, my hypothetical assumes they would. In other words, if they had contracted correctly, right, if they contracted to get all of the monies that they were entitled to, I guess, under the statute or whatever, that were not inflated rent. In other words, they were paying only for the rent. It was actual expenses. Then how? But instead, they got much less than how would the government charge criminally? Or is it your position that that's that's not a crime? Either way is fine. I'm just trying to understand your position. Well, the position if, in fact, there was a contract pursuant to which a valid contract pursuant to which the charities would have had a right to a substantial portion of the proceeds that that was not that they did not get. You could have charged it. That is not the circumstances in this case. This is all based on an allegation that the Masinos misled the charities. Okay. And the argument is, if they'd only told them the truth, that's, that's one argument. And what they've told them the truth, the charity said, every one of them said, well, if we had known that what they were doing was violation of the law, we wouldn't have done this at all, there would have been no bingo. Okay, so there's no money exchange at that point. The second thing is, count two. And this, I think this is a question you asked of Miss Forbes. Count the government's argument in count one is inconsistent with the government's argument in count two count one argues in count one, they argue that they that the charities had a right to the proceeds that were in fact being paid to the Masinos some of those proceeds. But in count two, they argued that they violated, they argued to the jury and the jury convicted on the fact that they violated count three of the bingo statute will count three, by arguing that they violated count three, the bingo statute, they are arguing that the charities are not entitled to any of the proceeds because count three of the bingo statute clearly says that if you violate this provision, the proceeds must be returned to the players, not to the charities. So count three, the government makes on count three is totally inconsistent with count one. It counsel. Thank you. I appreciate the response. Let me just take you back. I just want to make sure I understand your position is that in the hypothetical I have discussed the government could successfully charge and convict a defendant who who promised in a contract that the charities will receive all of the amounts over and above the actual rent expenses, but then inflated the rent expenses and provided the charities with trying to understand your position is that we're they did not First of all, they did not inflate the rent. I'm not asking you about your clients. I'm asking you a hypothetical. If they lied to them about what the rent expenses were, they could have charged it that way. That is not the facts. If that's the case, would that have been charged just as a straight up wire fraud conspiracy? Like, in other words, a contract where something was promised, but not delivered as a straight up wire fraud conspiracy? Yeah. And that gets to the essential problem with this case. Wire fraud requires that you take property or money from the victim that you are that you are not entitled to. That didn't happen in this case. It does happen in your hypothetical. You are saying that in that case that the charities are misled and about what the what the rent is actually going to be and that the people in your hypothetical collect that those proceeds that would have otherwise gone to the charities. In our case, though, that did not happen. There is there the charities were, first of all, they were paid exactly what they were told they would be paid in the contract. The contract was accurate to that extent. The only problem in this case, or the problem identified by the government in this case, is they say, well, they would have gotten more proceeds if the if if the machinists had told them the truth that they were doing this illegally. Well, the truth is, that's absurd. If the if the machinists had told them they were doing it illegally, there'd have been no bingo at all. Nobody would have made any money. And the charities would have not made any money. And so and this has been going on for years. So everybody knew exactly what was going on. I'm sorry, counsel, I'm a little confused. Why wouldn't there have been bingo? If they had told them? I mean, let's say that they were saying there wouldn't have done this for not for no, no money at all. Yes. Is that what you're saying? I mean, I'm saying I'm saying that if they told them, they were paying people to conduct bingo, that's illegal. And the charities have said if they were told it was illegal, they wouldn't have done it. They wouldn't have signed on, there would be no contract and without charity, because you got to have a charity to do this kind of bingo. Without a charity sponsor, there's no bingo. The if, if in fact, the charity knew the truth, or acknowledge that they knew the truth, okay, because there's good evidence that they didn't know the truth. But if they acknowledge that they are if they, if the charities are told this is illegal, there's going to be no bingo at all. There's no money for anybody. The charities don't lose any money in those circumstances. Let me make sure I understand your position. If they're told, I mean, there either they're told the truth. And then the charities can decide they're not going to do it because it's illegal how they're doing it. Or they do they comply with the statute, right? But then they're not making any money. And why wouldn't the charities do it if it were still offered as an opportunity? Well, I'm sorry, I didn't miss the last one. Good. Why wouldn't the charities what? Why wouldn't the charities do it? If, if they were if in fact, they did comply, if in fact, they didn't pay for the setup and the cleanup and all that kind of stuff. If they did comply, and they did comply with the rent and all that. Why wouldn't the charities do it? I mean, it seems to me the charities would jump on that opportunity. But perhaps there wouldn't be a financial reason for the defendants. Yeah. And to set it, first of all, what would happen if they were told the truth? Well, the answer to that is the charities said, if they were told it was illegal, they would have done nothing. Well, what happens? Then you expect you offer the speculation? What happens if the if the masinos decide to run it according according to law? Well, first of all, you don't know that anybody would have done it according to law, you don't know if any money would have been made, according to law, and the government speculates this in their in their report. But if they just decided to not pay the workers? Well, what would happen then? Nobody knows what would happen then you can you can you can extrapolate that it's likely that nobody would have worked if they weren't being paid, that there's likely that no money would have been made. But there really is no answer, no speculation and no evidence whatsoever as to what would have happened in those circumstances. I asked you about paying the workers, your clients paid the workers, right? Yes, ma'am. And they knew the workers were being paid. Yes, ma'am. They were not true, quote, volunteers, right? That certainly is the finding. Yes, ma'am. And and the bingo statue requires that they be true volunteers. Is that correct? That's correct. Okay, so it was and then forget about the actual expense part. Okay. Why did not not alone make it a illegal bingo operation? The workers were getting paid the statute per vid prohibits that because it's supposed to be to allow charitable bingo is supposed to really be volunteers from the charities. And they're all doing it to help the charity. Yes, ma'am. Well, if it is, if it is an illegal bingo, well, so it was an illegal bingo, the government proved it was an illegal bingo operation. What they proved is that the government proved just forget about actual expenses are versus real expenses. Whether somebody would have done it or not done it. What we're dealing with is what happened here. And the workers were paid. And that was enough to make it an illegal under state law. I'm not saying the wire fraud, but the bingo statute forbids the payment of workers and it is against the law to pay the workers. It was an illegal bingo operation on state law no matter on that ground alone. But the question then Okay, I'm just trying to cover that. Okay, then we'll get to that. And if it in fact is an illegal bingo operation on the count to then the charities would have gotten are entitled to no money at all under count one. Okay, because the statute says if it's an illegal bingo operation, under count three, which is what you just possibly, then the money must all be returned to the players and the money goes does not go to the charity. Okay, but I will get back to count one, but if it's illegal, then it was illegal. And so that would support the verdict on the count to well, the count to has an additional element and that is willfulness. And I don't think it's anything about Yeah, I mean, that was a fact dish for the jury that intent whether they I know he said he talked to Sheriff Cobb or whoever he talks to and he did this that was purely a jury issue the intent. Well, I would I would contend that particularly with regard to Dixon Masino that there's no evidence at all that she knew that this was a bingo parlor. After a bitter divorce. I'm not going to debate that I think this overwhelming evidence of everybody's intent here. More so than many criminal cases we have as to intent that is enough to go to jury. Okay, so I think I understand count to let's go back to count one. So as count one, your argument is that harm argument. Who is who has to have the harm? Is it the charities have to have the harm or the players have to have the chair under the under the theory under what Judge Rogers narrow theory she submitted. She directed the verdict. The charities have to be harmed. They have to be harmed. They are that they are the alleged victim in the indictment and and you have to have an intent to it. I know you contend and I'm not trying to dismiss that argument. I'm trying to understand it. So what you say there was no evidence that the defendants intended to harm the charities. So we're not talking about harming the players. We're harming the cherries. Yes, ma'am. But if there was enough evidence that the defendants intended to harm the charities, there would be enough evidence for that count. If the evidence was that they intended to take money or property from the charities by means of their deceit, right, which is that narrows it considerably. The government argued it has argued that harm to reputation, for example, is a factor. The judge has Rogers correct. What you said helps me. Let's go. I mean, I'll study the law. If there was enough evidence that there was intent to take property from the charities, that is harm them by fraud and deceit. Yes, ma'am. That's the elements of that would be enough. Yes, that is the elements of the work. Okay, I don't understand why. There's several ways to take property from people. One is not paying what they're owed, as well as go over there and physically steal the property. Why is it they were not given the prop, the charities all they were owed? Why is that not enough? Well, they were paid if they were they had a contract that said exactly what they were going to be paid and judge Rogers found correctly in the evidence supports that they were paid what they were owed. Okay, what what about the expenses for the volunteers? Was that part of the contract? I thought the contract just listed expenses relating to the realm of building and there was nothing in the contract about paying volunteers and maybe I'm wrong. No, they do agree to pay and the contract obligates them to pay the expenses. They agree. In fact, there's no tell me about the word volunteers and the one running there. What what does it say as opposed to the cleanup guy or the the people that are actually running the bingo calling out the numbers and not doing all that they got paid, right? It says that it says that they're required to pay all the expenses incurred in the bingo. And they had one of their one of the people from the charity board. Tony Mulaney went and observed the work. Everybody knew on the charities knew that they were paying. Tony Mulaney specifically approved it said the workers did an excellent the volunteers did an excellent. But the bingo charities didn't know the workers were being paid money though. Yes, they did. The Mulaney report says specifically, he knows that both the workers and the managers are being paid. It's in the report. It's in a footnote in Judge Rogers his order. That's one of the things she she talks about. And she testimony of Tony Mulaney's report is very, very clear to the charities. He is a board member of the charities. He goes and watch it. I mean, the whole thing is the charities knew what was going on. They went and watched the bingo. All right. They did reports on it. They had a they had a lawyer from Yale graduate lawyer who advised them on the legality of what they were doing. The contract says that they are responsible for seeing that the games are legally run. Okay, you've answered my question. Thank you, Judge Wilson for the indulgence. All right. And Miss Forbes, you've reserved some time for rebuttal. You're on mute, Miss Forbes. Thank you, Your Honor. Miss Forbes. Is that true? Is there evidence in the record that the charities had a lawyer review the bingo operation before they signed the lease with the racetrack bingo? And the lawyer reviewed it to make sure that the charities were getting what they intended to receive as a result of this operation. The only evidence was that there was a lawyer present at a meeting after after the fact in like in a 2015 meeting. So after they had been entering into these lease agreements with the Messina's for a number of years that and the board member that Mr McGee was talking about, he was not an attorney. He was just he had just written a report again in 2015 after the charities began to suspect that their that their agreements were in fact not lawful. They started to inquire and look into the expenses into the operations and started to dig deeper into the legality of the operation. But that only occurred after they had already been entering into lease agreements with racetrack bingo for a number of years. I would also note to Judge Hall's question that in the written lease agreements, it does not specify exactly how much the charities would be paying out of the bingo proceeds for expenses and supplies. It merely listed the lease amount fee per week that the charities were to pay for that for that year, and it varied between $21,000 a week and approximately $35,000 a week depending on the year. But the the oral agreement that racetrack bingo had with the charities was that they would be required off to have racetrack bingo take off the top of those payments. So the charities were aware of the payments. But again, the conspiracy to commit wire fraud is predicated on the fact that the defendants were taking those payments off the top, telling the charities that it was legal to do that when it was in fact not because they knew they were just taking that money to pay people to conduct bingo. So the government argued to the jury that with regard to count to that it was the charities who were the victims in the case who were on not with respect to count to based on the district judges partial judgment of acquittal. So we were only permitted to argue to the jury under that theory for count one for the conspiracy and intended to fraud. So with regard to count one, the government argued to the jury that the charities were the victims. Yes. Yes. How are they the victims of the proceeds of an illegal operation should have gone to the players rather than the charities. And again, this is our disagreement with the district court is that in the end, because it turns out that racetrack bingo was running an illegal gambling operation and taking in profit when they shouldn't have, the only way that they would have been legal under the district court's construction was for them to have returned all the proceeds to players. And so it was an after the fact determination of who owned those proceeds. But if it was a legal bingo operation, wouldn't that proceeds shouldn't may have gone to the players rather than the charities. They could have been legal in one of two ways is either they conducted bingo with no charitable involvement at all, and they gave all the proceeds back to the players or to under subsection to a had they, in fact, entered into a lawful lease agreement where RBI was just a pure vendor. All they did was provide market rent, rent space and tables and chairs at a market rent, sold them bingo supplies and help them pay help them find volunteers around bingo games, but did not pay those volunteers for the conduct of bingo. Then all the proceeds made there would belong to the charities and lawfully should have gone to the charity. So those were the two ways that racetrack bingo could have lawfully conducted bingo. They did neither specifically for count two purposes. We proved that they did not. They did, in fact, made profit. So they themselves are not a charitable organization. We're not acting on behalf of a charitable organization. And therefore all the proceeds should have gone back to the players after the act. In addition, I would note that just in closing that Mr. The defense's argument that simply because the government proved materiality, which is that the charities would not have entered and continued in these contracts had they known that they were in fact unlawful, or at least that was the object of the conspiracy. The fact that the contracts would never have existed if the charities knew everything to begin with, doesn't defeat the fact that it was in fact fraud, and an attempt to defraud and an attempt to harm. That would say that every case which charges fraud in the inducement means what there would be no intent to harm. So in an investment case, I think if that part of the inducement could never be used as a predicate for wire fraud, which the case law doesn't show. Thank you, counsel. And that concludes our argument in this case.